IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| COURTNY G. CAMPBELL | * | |
| Plaintiff | * | |
| v. | * | Civil Action No. JKB-14-3824 |
| LEROY A. CONRAD, II, *et al.* | * | |
| Defendants | * | |
| | *** | |

## MEMORANDUM

Pending[1] is defendants motion to dismiss or for summary judgment. ECF 26. The motion is unopposed.[2] The court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2014). For the reasons that follow, defendants' motion, construed as one for summary judgment, shall be granted.

## Background

Plaintiff Courtny Campbell ("Campbell"), who at all times relevant to the complaint was an inmate incarcerated at the Maryland Division of Correction's North Branch Correctional Institution ("NBCI"), claims he was subjected to excessive force and various forms of retaliation because he endeavored to assist another inmate with legal matters. His first claim concerns an alleged incident occurring on September 30, 2014, involving Officer Leroy Conrad. Campbell claims that he was scheduled for an institutional pass and Conrad came to the housing unit, accompanied by Officer Passman, to escort Campbell for that purpose. ECF 1 at p. 4. Campbell

---

[1] Also pending is plaintiff's motion for reconsideration of this court's order denying appointment of counsel (ECF 13) and a motion to appoint counsel (ECF 23). Both motions shall be denied. As noted below, plaintiff has been released and has not updated his current address with the court in contravention to Local Rule 102.1.b.iii.

[2] Plaintiff was sent notification regarding his right to file an opposition response to the dispositive motion (ECF 27), but the notice was returned as undeliverable by the prison mail room. ECF 29. The envelope was marked "released." ECF 29.

claims that Passman left[3] and Conrad began to verbally accost Campbell for his decision "to be a witness for the cry baby." *Id*. Campbell states that he believed that Conrad was referring to the inmate in the next cell who Campbell refers to as "Yahya." *Id*. Campbell claims he did not initially respond to Conrad's statement, but that Conrad continued to make veiled threats and advising that Campbell mind his own business "because shit happens here." *Id*.

At that time Campbell claims he advised Conrad that he was going home in a few months. Campbell began talking to his "neighbor," who asked Campbell to take his Administrative Remedy Procedure complaints ("ARP") with him so that they could be signed. *Id*. As Campbell exited his cell he asked Conrad if he could "grab the ARP's" and Conrad told Campbell he could do so. *Id*. Campbell exited his cell and called to his neighbor to stick the ARPs out of the door so he could collect them. Conrad then told Campbell, "no, no he don't get no favors let's go." *Id*. When Campbell protested as Conrad yanked him by the arm, Conrad advised Campbell he would need to get the ARPs when he returned. Campbell attempted to explain that he needed to collect the ARPs before leaving in order to get a sergeant to sign them. *Id*. at p. 5.

Campbell claims that Conrad became "agitated," started cussing at him, and slung him into the "escalation door." ECF 1 at p. 5. Campbell alleges he then asked Conrad to simply put him back into his cell. Instead of complying with Campbell's request, Conrad threw him into the wall repeatedly slamming his head, back, and arms into the wall while he was tightly handcuffed. *Id*. Campbell claims he suffered cuts, bruises, minor welts, swelling, and a "gumball size knot" on his hand as a result of the assault. *Id*. Campbell alleges that Conrad then began to try to bend

---

[3] Defendant Conrad does not recall Passman being present at the time of this incident. ECF 26 at Ex. 6. This disputed fact is, however, immaterial as Passman is not a defendant in this action.

his arms in an upward motion while he tried to "sling" him to the floor. *Id*. Campbell claims his head and back were again slammed into the wall. *Id*.

Campbell claims that Officer Passman then arrived on the scene and Campbell began speaking with Passman. *Id*. Campbell alleges that Conrad then "lost it," called him a "bitch," and grabbed him into a choke hold, squeezing hard enough that Campbell "nearly lost consciousness." *Id*. Campbell states that Passman made Conrad release his lock on Campbell. *Id*. Once released, Campbell alleges that Passman allowed him to walk back into his cell and asked him what the problem was. Campbell told Passman that Conrad had told him he could get ARPs and then "went crazy once seeing it was for Wagner." *Id*.

Campbell claims he was still coughing and trying to get his breath when Officers Rounds, Jr., Gilpin, and Reed arrived at his cell, attempting to calm him down. ECF 1 at p. 6. Campbell states he told these officers that he was injured and could not breathe properly. *Id*. Campbell was taken to medical and then "taken to [his] pass." *Id*. Campbell states he spoke with Sgt. Brian Iames at his cell, asking for ARP forms, pictures of his injuries, and initiation of an investigation. *Id*. Campbell claims that Sgt. Iames said, "I thought we squashed everything?"[4] *Id*. Campbell then informed Iames that the officers "keep messing with [him]" and that when he writes a complaint it is ignored because he is a mental health inmate. Campbell again asked for ARPs, advised he was in pain, and told Iames that he had been "brushed off all day." *Id*.

Following the assault, Campbell claims his hand and his head "swelled," his neck remained painful for days, his throat was sore, and he lost feeling in his left forearm and hand for days "from the circulation being cut off." *Id*. He claims "they never allowed me a visit to medical" and states he believes correctional staff was interfering with his efforts to obtain medical attention. *Id*.

---

[4] Campbell does not explain what is meant by this statement. ECF 1 at p. 6.

Campbell's second claim concerns events he alleges occurred on April 29, 2014, when Officers Rounds and Gilpin sprayed chemical agents through his cell door and also went "into the maintenance shaft" to deploy chemical agents through the vent, sink, and toilet in his cell. ECF 1 at pp. 6 – 7. He claims this was done maliciously and for the purpose of retaliation as he was "a witness to multiple beatings of another prisoner." *Id*. at p. 6. Campbell further claims another form of retaliation used against him was to deprive him of his psychotropic medications "on various occasions," causing his behavior to become "eccentric and impulsive." *Id*. at p. 7. He alleges that the "eccentric and impulsive" behavior is then used as a basis to extract him from his cell; take his meals and property; place him on staff alert "constantly"; and to move him to a stripped, isolation cell where he is left wearing only a pair of boxers. *Id*.

Campbell claims he was told if he did not "stay clear of prisoner Wagner that they will keep [him] here until [he] go[es] home and make things very hard for [him]." ECF 1 at p. 7. Campbell alleges he informed Rounds and Crowe that "Yahya was one of the best guys in here" and that they should not have done what they did. *Id*. After making this statement, Campbell claims that his food and medicine were taken and he was placed on staff alert. *Id*.

Campbell alleges that each time he filed an ARP regarding the harassment, he never received a response. He claims he wrote to Warden Bishop, Regional Director Wayne Webb, and the Commissioner of Correction but never got a response "until now." ECF 1 at p. 7. Campbell states he also wrote to Laura Moulden and Bruce Liller seeking help because he was depressed and was not receiving his medication. He asserts that he tried to speak with "Ms. Janette during walks," but she ignored him or called him "crazy or retarded." *Id*.

Campbell states he asked the Warden and Assistant Warden Richard Miller to come to housing unit one so that they could learn about prisoners at NBCI being beaten and abused, but

neither complied with the request. *Id*. at p. 8. Additionally, Campbell claims he wrote to Bruce Liller to inform him that correctional staff were interfering with nurses dispensing medication to Campbell as well as other inmates "out of spite, retaliation, and/or punishment," but Liller did not address the issue. *Id*.

In his amended complaint, Campbell claims he was again subjected to retaliatory action on December 18, 2014. ECF 15 at p. 3. After finishing his scheduled shower, Campbell asked Officer Walker if he could see Sgt. Iames, the housing unit supervisor, because Walker would not assist Campbell.[5] Walker responded that Campbell wasn't going to see anyone and that he did not do favors for inmates that file charges on his friends. *Id*. Campbell states that Walker was referring to Conrad and Walker's "relative C.O. Cinda Walker whom I and others are witnesses against." *Id*.

After Walker refused Campbell's request, Campbell admits he began to kick the shower door and, in the process, kicked the "slot flap knocking it off the door." ECF 15 at p. 4. Officer Gilpin arrived at the area after he heard the metal slot hit the floor. Gilpin ordered Campbell to turn around so he could be handcuffed. Campbell claims he complied with this request and he was removed from the shower and taken to the C-Tier dayroom, where he was placed in a 2 X 2 steel cage. *Id*. at p. 4.

While in the cage where he remained cuffed behind his back, Campbell claims that Walker taunted, threatened, and harassed him for his alleged involvement as a witness in John Wagner's case. Campbell asserts he was never a witness in Wagner's case and attempted to explain this to Walker. ECF 15 at p. 4. Campbell further admits that a "verbal combatancy (sic) ensued" because he had not been receiving his psychotropic medications, affecting his ability to "perform when afraid and/or threatened." *Id*.

---

[5]   Campbell does not specify the assistance he asked Walker to provide.

Campbell then admits he "stepped [his] restraints" so that his cuffed hands were now in front, and, ignoring Walker, he picked up a phone through the cage bars. Campbell states he was on the phone acting as if he was telling someone on the other end of the phone what an "asshole this police was while laughing." ECF 15 at p. 4. Walker ordered Campbell to put the phone down; Campbell did not comply. *Id*. at p. 5. Walker then "gassed" Campbell in the face in close proximity and left the dayroom. *Id*.

Campbell claims that "moments later" Lt. Wilt, Sgt. Iames, and two or three other officers returned to the area and, despite Campbell's incapacitation by the chemical agent, restraints, and confinement in the cage, sprayed him again with a chemical agent. ECF 15 at p. 5. Campbell claims that Wilt "emptied his canister" and left to retrieve another. *Id*. Sgt. James, Walker and "several John Does began to spray [him] inordinately." *Id*.

Following the incident, Campbell claims that he did not receive a decontamination shower, nor was he given any medical attention for chemical exposure. He further asserts he was not given an opportunity to speak with an investigator. *Id*. Campbell claims he was moved back to his cell where everything had been removed and the water had been shut off. *Id*.

Campbell was placed on "staff alert" and claims he was denied his psych medication by Officers Crowe, Nave, Porter, Barrett, and others. He claims he received bag meals which were thrown on the floor "in the chemicals" that were on the floor. Campbell states he felt a burning sensation in his "posteria" (sic) and groin area because one of the defendants directed chemical agents to that area of his body. ECF 15 at p. 6. Campbell claims he repeatedly begged and pleaded for a shower because "he continued to burn for days" and made the request for a shower on every shift. *Id*. Campbell also claims he asked the "walk around nurses" to pull him out to be properly treated for chemical exposure, but the nurses ignored him. *Id*.

6

Campbell alleges he was not given a shower until four days later, after inmates John Wagner and Rodney Solomon held their feed-up slots open in protest. Campbell claims he was given a short five-minute shower, but by this time his skin had peeled leaving areas pink and raw to the touch. ECF 15 at p. 6. Campbell claims this entire incident constitutes excessive force as well as retaliation in an effort to coerce him into withdrawing his complaint and deterring him as a witness. *Id*.

With respect to the September 30, 2014, incident, defendants assert that Campbell filed an ARP on October 19, 2014, complaining that Conrad had assaulted him by slinging him into a door, throwing him into a wall repeatedly, and attempting to bend his left arm to force him to the floor. ECF 26 at Ex. 2, pp. 15 – 17. Additionally, Campbell claimed Conrad had slammed his head and back into a wall and choked him to near unconsciousness. *Id*. On the same date, Campbell also sent a letter to Commissioner Roderick Sowers, claiming his ARP had not been processed. *Id*. at p. 18. The complaint was referred to the Intelligence and Investigation Division ("IID") at the direction of the Commissioner's office. *Id*. at p. 19.

The IID investigation was conducted by Sgt. Corey McKenzie, who interviewed Campbell on February 2, 2015. ECF 26 at Ex. 2, pp. 3 – 4. During the interview, Campbell explained that when he tried to get some ARP forms from inmate Wagner, Conrad prevented him from doing so. Campbell further related that Conrad started pushing him against the wall and that Rounds escorted him back to his cell. Campbell identified no witnesses to the incident during the interview, but had previously identified two other inmates as witnesses. *Id*. Campbell also told McKenzie that he was evaluated by medical staff for his injuries and he was provided with pain medication. *Id*.

McKenzie interviewed Conrad, who maintained that when he attempted to prevent

7

Wagner from passing papers to Campbell, Campbell "struggled with him," so he "placed him against the wall." ECF 26 at Ex. 2, p. 5. Conrad explained that the escort became a "controlled escort." Rounds arrived and took over escorting Campbell back to his cell. Conrad advised that he had no further contact with Campbell after Rounds's arrival and claimed he knew of no injuries sustained by Campbell during the incident. Conrad further denied assaulting Campbell. *Id*.

McKenzie reviewed Campbell's medical records on February 3, 2015, and discovered he had been seen by medical staff on September 30th, October 1st, and October 2nd. During those encounters with medical care providers Campbell did not mention injuries sustained during the alleged assault by Conrad. ECF 26 at Ex. 2, p. 6, *see also* Ex. 1, pp. 1 – 28. Based on his investigation, McKenzie concluded that there was no basis to bring assault charges against Conrad, given the absence of any physical evidence or witnesses to corroborate Campbell's account of the events. ECF 26 at Ex. 2, p. 9.

Beyond the IID investigation, defendants assert that Campbell's medical record provides no evidentiary support for his claim that he was injured by Conrad's alleged assault. Significantly, Campbell was seen in the chronic care clinic on October 20, 2014, one day after he filed an ARP claiming he was assaulted and had suffered injuries. ECF 26 at Ex. 1, pp. 15 – 17. During his examination by Dr. Ava Joubert, there was no sign of any of the injuries claimed by Campbell the day before in his ARP. *Id*. at pp. 29 – 30. Defendants point out that the first mention of any of the injuries claimed occurred on November 9, 2014, the eighth time Campbell was seen by medical staff after the alleged assault. *Id*. at pp. 35 – 37. At that visit, Campbell claimed his neck and lower back pain began on September 30, 2014, but also explained he had a prior history with this condition and had received previous treatment. *Id*. Campbell did not

claim the injuries were the result of an assault by Conrad. *Id*.

Use of Force Incident Reports were prepared following the December 18, 2014, incident wherein Campbell was subjected to pepper spray. ECF 26 at Ex. 12. According to Walker's report, he was in the process of conducting a strip search of Campbell in a security booth located in housing unit 1, C wing dayroom, because Campbell failed to return a razor after his shower. *Id*. at p. 3. During the search, Campbell became irate and non-compliant, stepping through his handcuffs and spitting on the floor. *Id*. Walker left the dayroom in an attempt to provide Campbell time to cool down, but Campbell escalated his recalcitrant behavior by attempting to "remove and destroy the state telephone located close to the booth." *Id*. Walker gave Campbell a direct order to stop and tried to retrieve the phone from him. *Id*. Campbell responded by spitting directly into Walker's eye. *Id*. Walker then deployed pepper spray while repeating direct orders to stop. *Id*. When "other officers" arrived on the scene, Walker grabbed Campbell by his shirt, shoulder, and head area in an attempt to control him and prevent him from spitting on anyone else. *Id*. Walker states this attempt was not successful because his arm would not fit through the slot on the cage, so he left the scene and had no further involvement. *Id*. at pp. 3- 4.

The report prepared by Sergeant Iames indicates that Campbell was "yanking and smashing the handset from the telephone" when he arrived. ECF 26 at Ex. 12, p. 5. Iames witnessed Campbell spit into Walker's face during Walker's attempt to control Campbell. *Id*. He reports that Lt. Wilt sprayed Campbell with a burst of pepper spray and, as Wilt walked away, Campbell spit on the back of Wilt's left leg. *Id*. Iames further states that Campbell behaved as if he were going to spit on him and in order to prevent Campbell from doing so, he pepper sprayed Campbell, but Iames claims the pepper spray was not effective. *Id*. Iames continued to order Campbell to stop destroying state property, but Campbell continued yanking

9

and smashing the handset of the phone. *Id*. at pp. 5 – 6. At this time Iames and Wilt again pepper sprayed Campbell to gain his compliance. *Id*. at p. 6. Wilt ordered all staff to leave the dayroom, posting one staff member to observe Campbell. After several minutes, Campbell began to comply with orders and "stepped back through his handcuffs." *Id*. Iames states that Campbell initially refused medical treatment, but then changed his mind. He was escorted to the medical room in the housing unit where he was examined by Registered Nurse Roy Claycomb. *Id*. Iames took pictures of Campbell following the examination and Campbell was then offered a decontamination shower. *Id*. Campbell refused the shower and said he just wanted to go back to his cell. *Id*. Since Campbell's behavior continued to be disruptive, he was placed in a different "educational booth" to allow him to calm down and to avoid disruption to the tier. *Id*. Iames reports that "[a]fter a short period of time . . . Campbell was given a lunch meal and returned to his assigned cell." *Id*. Campbell was escorted to his cell by Rounds and Gilpin without further incident. *Id*.

     Lt. Wilt's report relates the same events as Sgt. Iames. ECF 26 at Ex. 12, pp. 7 – 8. He explains that the first canister of pepper spray he used on Campbell was one he took from Walker while he was trying to physically control Campbell and that it was almost empty. *Id*. Wilt confirms that as he left the dayroom to retrieve another canister, Campbell spit on his left leg. *Id*. at p. 8. He further explains that the pepper spray achieved its purpose when Campbell lost interest in destroying the phone and at that point he ordered staff to leave the dayroom. *Id*. When Campbell initially refused medical evaluation, Wilt told Nurse Claycomb to speak with Campbell to obtain the refusal directly from Campbell. After speaking with Claycomb, Campbell agreed to the medical evaluation. *Id*. Initially, Wilt ordered the use of leg irons and a spit mask on Campbell, but noted that the spit mask would interfere with the medical

examination. Instead of the spit mask, Wilt ordered that Campbell be escorted to the medical room walking backwards. *Id*. Wilt states that "Campbell's level of physical and mental hysteria necessitated his return to another Security Cage in the dayroom" following the medical evaluation. He further confirms that Campbell refused a decontamination shower. *Id*.

An investigation into the December 18, 2014, incident by IID Detective Melissa Mack concluded that the force used was appropriate and consistent with applicable regulations. ECF 26 at Ex. 12, p. 24. Mack attempted to interview Campbell, but he refused to make either a written or oral statement. *Id*. at p. 28.

With regard to Campbell's claim he was doused with chemical agents on April 29, 2014, by Rounds and Gilpin, defendants assert that conclusive video evidence proves the allegation false. ECF 26 at Ex. 12, p. 29. Campbell filed an ARP complaining of this incident and an investigation ensued. Review of the tier video revealed that Campbell had flooded the tier, as evidenced by water flowing from under the cell door onto the tier. *Id*. at pp. 30 – 32. Officer Rounds stepped into the pipe chase to turn the water off and could be seen on video doing so. *Id*. at p. 31. Gilpin never went into the pipe chase and the investigator notes that Rounds's foot position shows he was at all times facing away from Campbell's cell. *Id*. Additionally, his claim that pepper spray was deployed through the pipe chase into his cell is not possible as the pipe chase is closed to the cell, leaving no opening to deploy pepper spray. *Id*.

With respect to Campbell's claims of retaliation through withholding medication and meals, defendants assert that his receipt of his medication was monitored closely. They further provide that Campbell is "a mental health inmate" with a known "history of severely disruptive behavior which includes false reports of facts." ECF 26 at Ex. 3. During the time frame relevant to the incidents in this complaint, defendants state that Campbell engaged in a hunger strike in

November of 2014 and required assignment to suicide watch in December of 2014. Any changes in his medication were due to the need for addressing those exigent issues and not for purposes of retaliation. *Id.*, *see also* Ex. 1, pp. 39 – 59 and 81 – 86 (medical records addressing hunger strike and suicidal ideation). Bruce Liller further suggests that Campbell is "easily impressionable" and that correctional staff have witnessed Campbell being adversely influenced by another inmate, John Wagner, who is believed to have written most if not all the allegations raised in this case as well as the ARPs and sick call slips submitted in Campbell's name claiming a lack of care. *Id.* at Ex. 3, p. 2.

**Standard of Review**

Rule 56(a) of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting former Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the

witnesses' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**Analysis**

Excessive Force

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). This court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *Whitley v. Albers*, 475 U.S. 312, 321 (1986). The absence of significant injury alone is not dispositive of a claim of excessive force. *Wilkens v. Gaddy*, 599 U.S. 34 (2010). The extent of injury incurred is one factor indicative of whether or not the force used was necessary in a particular situation, but if force is applied maliciously and sadistically, liability is not avoided simply because the prisoner had the good fortune to escape serious harm. *Id.* at 34.

The undisputed evidence establishes that Campbell's own behavior necessitated the use of force against him on September 30, 2014, and December 18, 2014. The absence of any evidence that Campbell suffered an injury as a result of the use of force strongly suggests that the force used was tempered and limited to that necessary to restore discipline. Indeed, the court notes the restraint exercised during the December 18, 2014, incident when Campbell assaulted

staff and refused to stop efforts to destroy state property. Walker attempted to allow Campbell time to calm down; Lt. Wilt and Sgt. Iames ceased use of pepper spray despite Campbell's continued disruptive behavior and allowed the chemicals to take effect; and Campbell was again given time to calm down following his medical evaluation in a setting where he could not harm himself or destroy property in his cell. Campbell's encounter with Conrad was likewise a restrained reaction to disruptive behavior. With regard to the alleged incident where Campbell claims Rounds and Gilpin pepper sprayed him through the pipe vent, the claim appears to be simply false. However, even if Rounds and Gilpin had deployed pepper spray at Campbell while he was in the process of flooding the tier, the force alleged is not outside the realm of reasonable measures used to restore discipline. In this instance, officers again took a restrained approach that does not begin to approach a constitutional violation. Defendants are entitled to summary judgment in their favor on the claims of excessive force.

## Retaliation

In order to prevail on a claim of retaliation, a plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). It is unclear how much of a showing of adversity must be made in order to survive a Rule 56 motion for summary judgment. As to the sufficiency of a claim for relief under Rule 8(a), see *Burton v. Livingston*, 791 F.2d 97, 00-101 (8th Cir. 1986) ("complaint that a prison guard, without provocation, and for the apparent purpose of retaliating against the prisoner's exercise of his rights in petitioning a federal court for redress, terrorized him with threats of death" sufficient to state claim). "'A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone.'" *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir. 1987) (quoting

*Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)); *Pierce v. King*, 918 F. Supp. 932, 945 (E.D.N.C. 1996) (conclusional allegations of retaliation insufficient to state claim).

> Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights. *Perry v. Sindermann,* 408 U.S. 593, 597 (1972). Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim.

*ACLU of Maryland, Inc. v. Wicomico County*, *Md.*, 999 F.2d 780, 785 (4th Cir. 1993).

"In the prison context, we treat such claims with skepticism because '[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (quoting *Adams*, 40 F.3d at 74). Indeed, Campbell has the burden of showing that retaliation for the exercise of protected conduct was the "substantial" or "motivating" factor behind the conduct of Defendants. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

Campbell must establish that the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution or was not narrowly tailored to achieve such goals. *Rizzo v. Dawson*, 778 F.2d 527, 532 & n.4 (9th Cir. 1985). The preservation of internal order and discipline constitutes a legitimate goal of the correctional institution. *Id*. at 532. After a prima facie showing is made, the burden shifts to defendants to demonstrate that they would have reached the same decision even in the absence of Campbell's constitutionally protected conduct. *Mt. Healthy*, 429 U.S. at 287.

Campbell alleged that his medication was withheld and he was subjected to uses of force for the purpose of discouraging him from pursuing the claims asserted in this case and acting as a witness for another inmate. While both of those activities are constitutionally protected, he has

failed to dispute the evidence produced by defendants that each adverse action taken against Campbell was supported by the legitimate correctional goal of restoring discipline. It is clear from the undisputed evidence that each of the decisions made to employ force would have remained the same without Campbell's institution of the instant case or any stated intent to act as a witness for another inmate. Moreover, there is no evidence that Campbell was denied medication or psychological services or that correctional staff interfered with the delivery of those services. In fact, this court is hard-pressed to imagine why correctional staff would prefer to have Campbell's mental health further deteriorate, making his behavior more disruptive. Defendants are entitled to summary judgment on this claim.

      A separate order, consistent with the content of this memorandum, follows.


<u>October 16, 2015</u>                                                             _____/s/_____
Date                                                                         James K. Bredar
                                                                          United States District Judge

.